2007, 5047, 5082. Mr. Hungar, when you are ready. Good morning, Your Honors. May it please the Court. The judgment of the Court of Federal Claims should be reversed because there was no breach or material breach. Plaintiffs elected to treat any breach as partial, and the $1 billion restitutionary award is a windfall that is contrary to this Court's precedence. The 1990 amendments to the Coastal Zone Management Act did not breach any clear, unqualified contract right, because plaintiffs had no right to obtain suspensions without Coastal Management Plan consistency review. The contract says only that the government may issue suspensions if it deems them to be in the national interest, an inherently discretionary determination that inevitably changes over time with the shifting views of government policymakers. Nothing in the contract barred the government from deciding at any point, including immediately after the leases were signed, that it would conduct and require consistency reviews before deciding whether to grant suspensions. So it can't possibly be a breach of a clear, unqualified contract right for Congress to have done precisely that. This case is completely different from mobile oil because the contract right... Let me ask you on that question, Mr. Hungar. Is your argument broad enough that you would be saying, for example, as long as there is at least some hypothetical possibility, which would be legally permissible, that the government would foreclose the exploitation of leases under a national security justification, that by virtue of that alone, that power, even though there might be all parties at the time that the contract is entered into, would assume, and probably correctly, that the likelihood of that being invoked would be very slim. But that itself means that no change, that no matter how much more likely it makes it that the leases will not be allowed to be exploited, would be not a breach. That is to say, even if the Congress changed the statute to say that, well, in order to exploit the leases, you have to get the approval of all political parties, including the Green Party, which would reduce to presumably vanishingly small the chance of the plaintiffs being able to exploit their leases. Does your position go that far? It certainly doesn't need to go that far. I understand. I don't think I would be inclined to try to defend at that level, at that extreme. I mean, I think what this contract did was grant the government a wide range of discretion. You don't think the state of California and the Green Party are equivalent? I won't speak to that question. But this contract granted a wide range of discretion, a reserved wide range of discretion to the government. It is conceivable that in the situation that you posit, it would be an abuse of the discretion that was reserved to the government. It would exceed that wide range of discretion. And if it would exceed that wide range of discretion, then it would be something that could be set aside. You mean the national security? National interest. I'm sorry, national interest. One could make an APA challenge to it. Exactly. But assume that the national interest factor were written into the statute in such a broad way that it couldn't be challenged, but all parties knew that the likelihood of it actually being invoked as a matter of fact is very slim. This goes to the gateway question. I mean, if as a practical matter, everybody can fairly assume that that's not at all likely to happen, and the change in the statute makes the practical likelihood of foreclosure much greater, is that a breach? Well, I would say no, but even if it would be, this is not that case because there's no such allegation. And again, the discretion is not completely unlimited. You can imagine hypotheticals in which it would exceed the government's discretion. And in those circumstances, what the government did would appropriately be set aside. But there's been no allegation here of anything approaching that. There's no suggestion that the government couldn't have decided in 1995 that it was going to do consistency review before granting any further suspensions and that there would have been any breach of the contract, at least if the executive branch had done it. Somehow the plaintiff suggests that if Congress rather than the executive branch speaks to the question of national interest, that becomes a breach, but that makes no sense at all. And certainly, before you could construe a contract to constrain Congress's ability to speak to the national interest, just like other government officials can speak to the national interest, I would think you would require unmistakable language to that effect. And there's no unmistakable language here saying that Congress has no role to play in assessing this very wide grant of discretion retained by the government. All Congress did in the 1990 amendments was speak to what it viewed the national interest to be. In fact, it amended the statement of national policy in the Coastal Zone Management Act, Section 1652.5, to make clear that it is national policy to ensure to maximize cooperation consultation between the state and federal government with respect to things affecting the coastal zone. That's what the government has done here, so it can't possibly be a breach for the government to have exceeded that. In effect, if the leases were issued at the time, subject only to the statutory and regulatory provisions which were in effect, any changes made by the government at that point, or Congress, or whatever, changing the impact of the ability of the government to pursue the effect of that lease, did that really make a material change to the lease? It would if we had a situation like we had in Mobile Oil, where the Mobile Oil court said, the function of Section 1, that provision in the lease that you're referring to, is to incorporate into the contract, as promises, the pre-existing statutory and regulatory provisions. So those are now promises in the contract. One of those promises was, actually it's a reserved right of the government, it's not a promise to the plaintiffs, it's a reserved right of the government that says the government may, if it so determines, and if it concludes that the national interest warrants it, it may grant suspensions. It's not a right or expectation of the plaintiffs, it's simply a reserved retained right of the government. That's all the pre-existing promises incorporated into the contract say. So the question is, has what Congress done in the 1990 amendments breached that promise? And the answer is no. It is still within the government's ability to decide whether it is in the national interest, one aspect of that consideration being consistency determination, and then based on whether it is in the national interest, to decide whether or not to grant the suspension. So nothing that the government has done through the 1990 amendments departs from the terms of the pre-existing contract, which is why there's no breach. And in addition, I would submit, there certainly can be no material breach, in the circumstances of this case, even if there had been some sort of a technical breach, which again, because plaintiffs essentially assumed the risk that the government's assessment of the national interest would change, there can't possibly have been a breach at all. But even if there were, the core promise of these leases, as the court construed them in Mobile Oil, the gateway that Your Honor referred to, is the opportunity during the term of the leases to try to get approvals to do exploration and production. And in Mobile Oil, the court said the United States breached that, it foreclosed that, because the very gateway to that fundamental right during the five-year terms had been narrowed. But here, the government did nothing to narrow the gateway to exploration during the five-year term of the contract. In fact, it gave the plaintiffs the full, or rather their predecessors, the full five years in which to explore. They exercised that right. They explored these leases. They rolled the dice or participated in the lottery drawing, if you use the Mobile Oil Court's analogy. They received substantial performance from the United States. Only at the end of that five-year period, where these leases are existing only by the administrative grace of the government in granting continued suspensions, it's a far different situation from what the situation was in Mobile Oil. But if the government had terminated the leases at the end of the five years, I could see there would be no problems, but it continued them. You're right, Your Honor, but the materiality of the breach has to take account of the very different circumstances we're talking about here. The gateway that was narrowed in Mobile Oil was a mandatory binding, the government shall approve within 30 days an exploration plan. It was the gateway to all further rights under the contract. They couldn't do anything of any significance without an exploration plan during the initial five-year term that the contract guaranteed them. Here the plaintiffs got to do all of that. They had exploration plans approved on nearly all of these units. They conducted exploration. Unfortunately for them, they found out that there wasn't much there of significant value. That's why there weren't attempts to bring these into production during the initial five-year term, unlike some of the other leases. So they've essentially received the great bulk, at least, of the value of the contract and all of the expectation that they had any right to when they entered into the contract was delivered by the government to the plaintiffs, unlike the case in Mobile Oil. So what we're talking about here is not a material breach going to the essence of the contract, but rather an alleged technical breach, which again we say is not a breach at all, that goes to the question whether the government, in its discretion as a matter of administrative grace, can continue giving them more than they were originally entitled to under the terms of the contract. So you would not consider the Coastal Management Act as a repudiation? No, Your Honor. Certainly not. How would you classify that? I would classify it as Congress speaking to the question of the national interest as it pertains to governmental actions affecting the coastal zone, something that the government reserved the right to do under the contract, when it said that when the plaintiffs assumed the risk that the government, which was retaining the right to determine the national interest, would change its views of the national interest and would assess the national interest in a way that was disadvantageous to the plaintiffs' interests. And as in the Admiral case, the fact that essentially the government did not unmistakably give away its right to change its assessment of this limited area of the contract, that doesn't mean that the other promises in the contract were illusory. The promises that the Court enforced in Mobile Oil are certainly not illusory. They were complied with here. If I may, I'd like to reserve the balance of my time if there are no further questions. You may do that, Mr. Hunger. Mr. Rosenbaum. May it please the Court, there is no question in this case as to why what happened happened, because it happened twice. First, the Mineral Management Service thought that it had no obligation, because of the changes brought by the 1990 amendments, to impose coastal zone management review with respect to the lease suspensions. And accordingly, the government granted those lease suspensions. Subsequently, the California v. Norton decision concluded that that was incorrect, that the 1990 amendments did require a Coastal Zone Management Act review, and that is what led to all the problems that are set forth in our brief and why it is a breach and a material breach. The point here is that the government, we don't here have to hypothesize as to why the government did what it did. It did what it did solely because of the 1990 amendments, and that is exactly what it states in its suspension letters. The question then is whether the government can now argue, well, hypothetically, we could have found some power elsewhere to do what we did, even though, in fact, we admit in our own documentation, the July 2, 2001 letters, that we did it solely because of the 1990 amendments. Well, but suppose that, to pick up, I think, on Mr. Hungar's point, suppose that instead of proceeding by legislation, the Department of Interior had decided that we need to flesh out this national interest business, and they had promulgated regulations which had a spooky resemblance to what actually was enacted as the 1990 amendment, and they said this is the way we will ascertain national interest. Would that have been a breach? Your Honor, I would submit it would have been a breach, but let me first address the question whether engaging in that hypothetical question is permissible under mobile oil, because this is exactly the argument that was advanced by the government in mobile oil. I'm not sure it's exactly the same. Well, Your Honor, the government in mobile oil said, yes, it's true that because of the enactment of the Animal Back to Protection Act, we've had to stop the processing of environmental plans to conduct an environmental study, but if you look at our separate powers of suspension, which also stop things from going forward, we can suspend the lease to conduct an environmental study. So mobile and Marathon and the other companies took on the risk that we would do that, so there's no breach. That is precisely the argument that was advanced by government counsel here, and the Supreme Court, and this starts at page 616 and goes forward from there, absolutely rejected that line of inquiry, that line of argument as being legitimate. The Supreme Court said we will not allow the United States government to hypothesize other powers they might have used when in fact we know that they acted directly and solely as a result of the change in the law put in place by the Outer Banks Protection Act. That is precisely the same issue that is raised by the government's arguments here. With respect, there are further... Well, let's bear with me on the assumption, counter to your contention, I understand, but that this inquiry is not foreclosed by mobile. Why does it matter, or does it matter in your view, that this was done by legislation as opposed to having been done by regulation? And again, pursuant to the national interest. The Coastal Zone Management Act had, by 1990, been definitively interpreted by the Supreme Court of the United States in the California Interior case as to when coastal zone management review was required. And there was a definitive ruling that it was not required at the lease stage. That was the setting in place. Right, and there are two ways to respond to that. One is by legislation. Presumably another would be administrative. Once the Supreme Court has definitively resolved when coastal zone management review is permissible under the statutory scheme, the executive doesn't have discretion to interpret it. Presumably the executive could write regulations that would say, well, we think that the views of the states are of critical importance here, and therefore we will consider them critically important. Never mind review, never mind a right to review in the court. But that's the critical part of it here, is that you have to establish perfect consistency with the state coastal management program. We're not talking here about asking the state what their views are. We're talking about a situation where there is an absolute barrier to progressing unless you meet Coastal Zone Management Act requirements. And that's not the regime under which we bought the leases.  Well, that goes to the crux of what I think is difficult about this case, which is the regime under which you bought the leases. This is a complex world, and the area that your clients are involved in is one of the most complex. Things change all the time. I mean, it's very difficult to tease apart those things that are kind of expected changes that you can anticipate and you would not regard as being a huge change in the underlying assumptions that are the predicate for the contract versus really major changes. What makes this fall into the second category? This change is so much worse than the change at issue in mobile oil, Your Honor. It's incomparable. In mobile oil, by the way, Justice Breyer in that case started out with a discussion of how our clients faced a lot of challenges in getting, if you will, to the goal post of production. But Justice Breyer did not interpret that as meaning that the government's promise was illusory. Justice Breyer interpreted that as evidence that the government's promise was critical because no one would pay the hundreds of millions or billions of dollars in this case to buy leases unless you had a promise that those procedures were not going to change, and that's what Section 1 provides. Now, in mobile oil, all that happened was there was an imposition of a requirement of a study assessing the impact of various activities on North Carolina. There was a set time period for that to happen, and the Secretary of the Interior was precluded from granting approval for exploration plans during that period. That was it. It was an environmental study requirement. There was no substantive requirement beyond that. Here, it's not a question of there being a procedural requirement to conduct an environmental study. It's a requirement of a demonstration of perfect consistency between the lease suspension request and the coastal zone management program of the state of California. And once again, we don't have to hypothesize as to its significance. We have included in Volume 5 of our joint appendix 300 pages from the state of California explaining why, in fact, these lease suspensions are not consistent with the state's coastal management program going on and on and on. Mr. Rosenbaum, I hate to interrupt you, but wasn't NEPA applicable to these leases from their inception? Were there environmental impact statements provided by the Interior Department with their governmental action in the issuance of the leases? There would have been an environmental impact statement in connection with at least the lease sale. I believe that's the case. That's not in the record. Those are not in the record. Is that correct? The environmental impact statements at the time the lease sale took place, I don't believe that. Those are in the record. That goes back to the early 80s. I presume you're representing all of the assignees? All but one, Your Honor. The aspects of the assignments. Some of the assignments took place after the 1990 Coastal Act was adopted. That's correct. Some before and some after. The Coastal Act was determined to be a repudiation of the contract. In 2001 it was. 2001. However, when it passed, was that a repudiation? Well, in retrospect, we know it was. At the time, neither the federal government nor we, the lessees, knew that. It was not until the California v. Norton decision ruled that, in fact, it had changed the regime applicable to these suspensions that we then knew it was an anticipatory repudiation. But under no circumstance, of course, was it a breach until the new requirements of the Coastal Management Act actually followed. Those assignments which took place after the enactment of the 1990 Coastal Management Act and assigned over, you're asking for restitution of all of the payments that were made by the original lessees. To the government. To the government. Assuming that those were repudiated in 1990, are the subsequent assignments an assignment of claims and not assignable under the Anti-Assignment Act of the government, or were those the Anti-Assignment Act waived when the lessees were assigned? Any Anti-Assignment Act issues are waived by the government when it approves an assignment. Automatically? Yes. Even though there's no specific reference to the waiver of the Anti-Assignment Act? Well, these are assignment to properties. The leases are properties. Of course, they're also contracts. Whatever rights adhere to those leases and contracts pass with the assignment. But you have an assignment of a claim, not a judgment. It's an assignment of the property and everything that goes with it, which would include any claims that are attendant to that property. And the critical factor here, of course, is that all of those were approved. The government raised in the trial court Anti-Assignment Act issues, which it had not pursued. Well, the assignments have not really been included in all of the appendices that we have. We have volumes of appendices, but not the copies of the assignments. And we didn't include them because the government didn't pursue that argument on appeal, Your Honor. But the Anti-Assignment Act was actually waived then in each one of those assignments? Well, under this court's precedence, if the federal government approves an assignment, then that— It's an automatic waiver? It's an automatic waiver. There doesn't have to be a specific statement. We are waiving our rights. We, the federal government, are waiving our rights under the Anti-Assignment Act. If the assignment is approved, then it's automatic. This court has found that in many cases, and that's settled law at this point. Would that go to the issue of entire restitution of the amounts paid by the original lessees? Or would that limit the assignees to the payments made to the original lessee? This court has—the unbroken rule is, as this court recognized in Insurance Company of the West, an assignee stands in the shoes—steps into the shoes of the assiduor. I understand that. It is the assiduor's payment. But if the assignee's takes with knowledge of the change in the law, does that make any difference? It makes no difference whatsoever. The assignee—as this court said, in Insurance Company of the West, applying the black letter law to the federal government, that the assignment of a property—the assignee of a property interest, quote, for all purposes, thereby transferring to the assignee the same right held by the assiduor with its advantages and disadvantages. The assiduor would have had the right to sue and recover the original lease bonuses, and so can the assignee. And how much the assignee paid makes no difference. Your Honor, Judge Bryson, to follow up, Section 1 does specifically limit the right to make regulatory changes. I'm talking about Section 1 of the contracts. So when you raise the hypothetical, could this change be made by regulation? The answer is no. Well, as I recall, isn't it that it limits the—it doesn't limit regulations under currently pending—statutes currently in existence, right? No, no. It's what it says. It's very important. It's very important. What it says is that there can be regulatory amendments under the Outer Continental Shelf Lands Act itself with respect to efforts necessary to provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf. Now, this is a point that we need to bear here, is that the coastal zone, which is the subject of the Coastal Zone Management Act, is not the Outer Continental Shelf. In fact, it is definitionally not. That is to say, the coastal zone— Beyond the shelf. Well, it's not just beyond. They meet. I mean, the coastal zone is the first three miles, and the next inch is when the—and further out a number of additional miles is where the Outer Continental Shelf goes. So specifically to your hypothetical, they could not do that because that would have been—if you were to change the regulations to address coastal zone issues, you would not be acting under the Section 1 Reservation of Powers, which is the reservation to the federal government of the right to make regulatory changes necessary to protect the conservation of the natural resources of the Outer Continental Shelf. And the specificity of this language, I think, goes a long way to answering the government's supposition that they have broad discretion here. It's very specific discretion and narrow discretion in Section 1 that's preserved the federal government and discretion that has nothing to do with what happened here. And this is not accidental. I mean, collectively, I think— I think you're about to get a question. I'm sorry. Well, let me just—you can finish up a little bit, but I would like you—well, no, go ahead and finish. I think you're heading in the direction of answering the question. Well, my point simply was that I think collectively the total lease bonuses paid on Outer Continental Shelf leases are $60 to $100 billion. I don't know what the latest figure is, but my point is you induce companies like my clients to make those kinds of upfront payments, huge upfront payments, by promising them what's going to happen from there on out. You don't promise them a result, but you promise them a regime, and that is what Mobile Oil said was critical. And they've changed that regime, and we know it because, as I said before, first they did it—MMS treated our suspension request as if the regime hadn't changed, and they granted our request in November 1999. And we were merely proceeding toward further exploration and development. Then the California Green Ordinance decision comes down June 20, 2001, and says that's wrong. You have to do a Coastal Zone Management Act review because of the 1990 amendments. July 2, 2001, the federal government says suspend all operations of the leases, and that's the way it's been ever since. Now, the contrast is absolutely clear. You did almost answer my question, the question I was going to ask, but to be clear, the day before the Norton decision from the district court, in your view, had the contract been breached? No. There was an anticipatory repudiation, as we now know, but no. The Supreme Court's decision in Franconia conclusively establishes that a change in law in and of itself is not a breach. It's only a breach when it is applied to you, and so it was applied to us on July 2, 2001. That's the date of breach because that's when the Minerals Management Service said this 1990 change in the Coastal Zone Management Act requires us to issue or suspend all operation of the leases. That's the date of breach. But the question, but you still say even if a reasonable person would have thought there's no likelihood at all that the Norton case would have come out the way it did in construing the statute, nonetheless, the fact that the statute was changed in 1990 constituted a repudiation even though at that point the chance of that statute being read the way the Norton court read it was virtually negligible. Would it still be a repudiation? Well, yes, because the Ninth Circuit's task is to determine the intent of Congress. Well, I know, retrospectively, but that's using a fiction that courts say what Congress means. We know that courts often say things that no one could have expected. The Ninth Circuit controls the interpretation of the Coastal Zone Management Act 1990 amendments with respect to activities offshore California. Absent a Supreme Court decision to the contrary, that's the law. You're bound by that decision, and so is the federal government, and like it or not, we didn't support the Norton decision. We intervened on behalf of the federal government in the Norton repudiation. Would it be a repudiation then? I mean, how would you look at whether it's a repudiation? How do you know it's a repudiation before you know how the court is going to come out? Well, I suppose there are some statutory changes clear on their face. Sure, if they said your leases are canceled and we're keeping your money, sure. The Franconia cases would be an example of that. The change in the law in Franconia said your right to repay these low-interest mortgages is terminated. Everyone knew there had been a repudiation at that point in time in Franconia. That happens. I was thinking of the other end of the spectrum, where there's a change that looks inconsequential until 10 years down the line a district court does something very unexpected. Is it a repudiation sort of nunc pro tunc? At least at the point in time when there's been a court of appeals affirmance of that decision, then yes, it's a nunc prunctum, because obviously this is a definitive ruling as to what Congress intended by the 1990 amendments, that the Coastal Zone Management Act requirements of the 1990 amendments did not only apply to the issuance of new leases, which everyone knew was the intent of that, but also applied to suspension requests with respect to pre-existing leases. But even though both parties did not consider that 1990 Act a repudiation? It turns out that both the federal government and we were mistaken, at least in the Ninth Circuit, but this is a practical situation. I mean, we have these leases offshore of California, which were stopped because of the suspension of operations from pursuing. Are all your leases within the Coastal Zone? No, none of them are within the Coastal Zone. These are all federal leases. Federal leases. The Coastal Zone is state waters. Right. Thank you, Mr. Rosenbaum. Mr. Hungar, take your full five minutes if you need it. Thank you, Your Honor. First of all, on the repudiation point, this is clearly not a repudiation. The test—I mean, this Circuit's precedent and the Supreme Court precedent is very clear. In De Conti, the Court relied on Dingley v. Oler, a Supreme Court case cited in a race, which said that it must be a distinct and unequivocal absolute refusal to perform the promise and must be treated and acted upon as such by the party to whom the promise was made. Unquestionably, that standard is not satisfied here, which is why I suspect plaintiffs barely even bothered to reference the issue in their brief on appeal. There was no repudiation. But, Mr. Hungar, wasn't there really a consideration of the act itself, 1990? Both parties did not consider that a repudiation. That's correct. At that point in time, until the Norton case came out. Both parties did not consider it a repudiation. I think that's correct. Both parties continued to perform the contract. If there was performance under the contract, should there be a repudiation going back to 1990, or should—? We think not, Your Honor. And as you've indicated in the brief, to the extent there's a repudiation in 1990 that does satisfy the standard for repudiation, then the plaintiffs have elected their remedy of partial breach because both parties continued to perform for more than a decade. Judge Bryson, your hypothetical about the day before the Norton 1 decision came down is significant because at that point, even under the plaintiffs' theory— the plaintiffs have this theory that you couldn't have made this change by regulation. We disagree. But put that to one side. Just as a matter of policy, on a case-by-case basis, or just as a matter of general policy going forward, the day before Norton 1 came down, the director of the Minerals Management Service could have said, you know what, I really think it's in the national interest, or the Secretary of Interior could have told him, or the President could have said, it's in the national interest to do consistency determinations, so we're going to do it for these cases. And the plaintiffs would be in exactly the same situation they're in now, and that was unquestionably within the discretion reserved by the government under the leases. The plaintiff says, oh, that's just like the argument the government made in Mobile Oil, but it's not. Here's the crucial difference. In Mobile Oil, the government had no argument that the promise made in Section 1340 of the Act and incorporated by Section 1 into the contract, the promise that said, we shall approve within 30 days your exploration fund. We had no argument that that promise had not been overridden by the subsequent legislation, but essentially our argument was, well, pay no attention to the fact that we breached that promise because we could have achieved the same result using some other authorities that don't have to do with that promise but are off over here to the side. And the court said, no, we couldn't have done that. They do apply, and what you did do is breach an unequivocal promise in the contract, and therefore you have a breach. But nothing like that happened here. They can't identify the promise. They have no analog to the promise that was made by the United States in Mobile Oil in Section 1340 of the Act, which was, we shall approve within 30 days. They have no analog to that. They just point to Section 1 as the section that was breached. The court in Mobile Oil didn't say it was Section 1 that was breached. The very beginning of the court's analysis, the starting point and foundation for the Mobile Oil discussion, the first sentence of Section 2 of the case of the opinion where they do their analysis is 1340 required the government to approve within 30 days. They didn't do that. That's the breach. That's what the court is saying, and Section 1 incorporated that promise into the contract. Section 1 really defines the starting point of what the promises are. The plaintiffs here have never been able to identify a promise that was breached because the only promise that pertains to suspension is a right reserved to the government that says we can do it if we want to, if we decide it's in the national interest. So it's totally different from Mobile Oil, I submit. With respect to the restitutionary relief and the incredible windfall that the Court of Federal Claims awarded these plaintiffs who spent only a fraction of the billion dollars they're seeking to recover from the taxpayers, this court's precedents in Admiral and Hanson make very clear that one thing restitution cannot do is put the plaintiffs in a better position than they would have been in if they had not entered into the contract in the first place, and it's unquestionable that's what the award does for these plaintiffs. Well, why wouldn't they stand in the shoes of the assignor? Well, first of all, the assignees, the assignors had no claim for restitution. They had no right at the time of the assignment to get a billion dollars back from the United States. The vast majority of these assignments occurred before even 1990, and as I said, even in 1990 there was no repudiation. So they had no right to assign, and if they had had a right, it would have been a claim, as Your Honor suggested, which would violate the prohibition against assigning claims. My understanding of the plaintiff's position in the trial court is that essentially there was no assignment of claims, but if their argument now is that there was an assignment of claims, then we submit it would violate the statutory prohibition against assigning claims. Even with the government approved the assignment? The only assignment approved by the government was the assignment of the lease. There was no suggestion that there were any claims being assigned. There was no disclosure, there was no identification, no submission of a claim, and liquidation, anything of that nature. Even for those leases that were assigned after 1990? Right, because no one thought there was a repudiation because the statute did not meet the test for a repudiation, which is absolute, unequivocal refusal to comply with a contract understood as such by both parties. It's just not what happened. So there was no repudiation. Again, the vast majority of assignments occurred prior to 1990. Thank you, Mr. Hungar. This will be taken under advisement. It was well argued. Thank you very much, both sides.